# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia ex rel.**
**West Virginia Department of Human Services,**
**Petitioner**

**v.) No. 24-582** (Berkeley County CC-02-2014-CIG-3)

**The Honorable Catie Delligatti,[1]**
**Judge of the Circuit Court of Berkeley County;**
**Jill B., Petitioner Below and Party in Interest; and**
**William Prentice Young, Guardian ad Litem of the child A.B.,[2]**
**Respondents**

**FILED**

**June 4, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner, the West Virginia Department of Human Services ("DHS"),[3] seeks a writ of prohibition to prevent the Circuit Court of Berkeley County from enforcing its September 26, 2024 order directing the DHS to pay $10,353.00 in vision care expenses for a child, A.B., who is not in the DHS's physical or legal custody, is not the subject of any currently pending abuse and neglect

---

[1] After the DHS filed this proceeding, the circuit court judge assigned to the case changed; the presiding judge is now the Honorable Catie Delligatti. Accordingly, the Court has substituted the proper party pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

[2] The DHS lists as respondents to its petition only the circuit court judge and Jill B. The child A.B. is a real party in interest to this petition for writ of prohibition, which relates to an underlying guardianship proceeding. As such, we include A.B., by his guardian ad litem, as a respondent to this proceeding.

[3] Petitioner appears by Attorney General John B. McCuskey and Assistant Attorney General Kristen E. Ross. Because a new Attorney General took office while this proceeding was pending, his name has been substituted as counsel. Respondent Jill B. is self-represented, and the guardian ad litem for A.B. is William P. Young.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect proceedings, the agency is now the Department of Human Services.

1

proceeding, has guardians who were appointed by the circuit court in a private guardianship proceeding, and does not qualify for a subsidized guardianship.[4] We find that this case satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure for issuance of a memorandum decision rather than an opinion. For the reasons set forth below, we grant the requested writ of prohibition.

The private guardianship proceeding underlying this original jurisdiction action was initiated by A.B.'s court-appointed guardians, Jill and Thomas B.[5] To provide context for the circuit court's decision that the DHS seeks to prohibit, we briefly describe the factual circumstances that led to Jill and Thomas B.'s court-appointed guardianship over A.B. Because of the limited record for this matter, the following facts are gleaned from the court's order, the parties' briefs, and the DHS's "Objection to and Motion to Reconsider the Circuit Court's June 12, 2024, Order," that it filed in the circuit court.

The tragic circumstances that ultimately led to A.B.'s guardianship began when he was conceived. A.B.'s mother, P.B., became pregnant at twelve years old after a family friend raped her. P.B.'s mother became aware of and reported the pregnancy when P.B. was about seven-and-a-half months pregnant. The DHS filed an abuse and neglect petition naming A.B.'s father as an offending parent and identifying his four children, including A.B., as abused and neglected children. P.B. was named in the abuse and neglect petition, but only as A.B.'s non-offending parent, and the court appointed counsel for her. A.B.'s father voluntarily relinquished his parental rights to his children, including A.B. The DHS did not file an abuse and neglect petition against P.B.'s mother, S.B., because it determined that S.B. took appropriate action after learning of P.B.'s pregnancy by contacting police, cooperating with the investigation, and preventing contact between P.B. and her assailant.

During P.B.'s pregnancy, she met Jill B. through a support program for teenage mothers. After A.B.'s birth, he and P.B. resided with S.B., but they regularly stayed at Jill and Thomas B.'s home. Jill and Thomas B. made over thirty referrals to Child Protective Services ("CPS") in the first three years of A.B.'s life, based on their belief that P.B. and A.B. were not safe in S.B.'s

---

[4] Because this case involves children and sensitive facts, we use initials when referring to certain parties and other individuals who we mention in background information. *See, e.g.*, *W. Va. Secondary Sch. Activities Comm'n v. David D.*, 251 W. Va. 102, ___ n.1, 909 S.E.2d 137, 139 n.1 (2024) (identifying parents and juvenile by their initials); *Aaron W. v. Evelyn W.*, 251 W. Va. 1, ___ n.1, 909 S.E.2d 36, 38 n.1 (2024) (using initials in family court case with sensitive facts); *see generally* W. Va. R. App. P. 40(e)(1) (restricting use of personal identifiers in cases involving children and sensitive facts).

[5] Although Thomas B. is a party to the guardianship action below, he does not appear to be participating in the proceeding before this Court. He is not identified as a party on the self-represented response filed by Jill B., and he has not filed his own response.

home.[6] CPS investigated all the referrals and found only one was substantiated. To remedy the one substantiated referral, CPS implemented an in-home safety plan and provided services to S.B. for more than eight months. The DHS did not file a related abuse and neglect petition against S.B.

In January 2014, Jill and Thomas B. filed a self-represented petition in the Circuit Court of Berkeley County seeking guardianship of P.B. and A.B.[7] and making numerous allegations that S.B. neglected the children.[8] The DHS was not named as a party to this private guardianship proceeding.[9] The court appointed separate guardians ad litem ("GALs") for P.B. and A.B. and referred Jill and Thomas B.'s allegations of neglect to CPS. After investigating the allegations, CPS found they were not substantiated. In a report prepared by P.B.'s guardian ad litem, the GAL described P.B. as "acting out" and failing to care for A.B. and recounted that P.B. had received therapy from three different counselors. The GAL encouraged Jill and Thomas B. to file an incorrigibility petition against P.B., to enable them to obtain services for her, such as parenting education, counseling, and participation in the Florence Crittenton program.[10] During a hearing on Jill and Thomas B.'s guardianship petition, the GALs for P.B. and A.B. mentioned the possibility of filing an abuse and neglect petition, but they did not file one.

After hearing the evidence presented, the court observed that "in these particular circumstances we have a child [P.B.] that has suffered a horrific event resulting in a pregnancy." The court considered S.B.'s delay in discovering the pregnancy to be a "colossal oversight and a

---

[6] The allegations made by Jill and Thomas B. in these referrals included unfit housing; lack of supervision; lack of discipline; and educational, medical, and dental neglect.

[7] *See* W. Va. Code § 44-10-3(d) (providing, in part, that "[a]ny responsible person with knowledge of the facts regarding the welfare and best interests of a minor may petition for an appointment of a guardian except a parent or other person whose rights to the minor have been terminated").

[8] Four different circuit court judges have presided over this guardianship proceeding. Judge Michael D. Lorenson was first, followed by Judge Laura V. Faircloth and Judge Bridget Cohee. Judge Cohee is now sitting in the Circuit Court of Jefferson County and the matter is assigned to Judge Catie Delligatti.

[9] *See* W. Va. R. Prac. & P. Minor Guardianship Proc. 2(c) (omitting the DHS as a party to a minor guardianship proceeding when it does not have actual or legal custody of a subject child, stating "[i]n addition to the petitioner, parties to a minor guardianship case shall include the minor or minors on whose behalf the guardianship is sought; every non-petitioner parent, provided his or her rights have not been terminated; and any other person with actual or legal custody of any minor who is a subject of the proceedings.").

[10] Shortly before the circuit court granted Jill and Thomas B.'s guardianship petition, they filed an incorrigibility petition against P.B., asking that P.B. be adjudicated as a status offender and alleging that P.B. failed to adequately care for A.B. Jill B. also explains that Crittenton is a residential treatment program for teenage mothers. P.B. and A.B. participated in a Crittenton residential program.

failure on the mother's part to recognize the pregnancy and damage to the child." The court found that P.B. was "exhibiting signs of mental issues," and was "desperately in need of services," but S.B. was unlikely to seek necessary medical and mental health treatment for P.B. Still, the court acknowledged that many of the issues in S.B.'s home resulted from her lack of financial means, which could not be the basis for the DHS to allege neglect.[11]

Regarding A.B., the court explained that he had "failed to thrive and had missed necessary medical appointments," while living with S.B. Furthermore, A.B. was "developmentally delayed, underweight, and . . . required attention beyond what his minor mother could provide" because "[P.B.] was not mature enough to safely care for a child of [A.B.'s] age by herself" and "needed close supervision by a competent guardian to ensure [A.B.'s] safety." Due to the conditions identified by the court, it found extraordinary circumstances pursuant to West Virginia Code § 44-10-3(f)(5)[12] and granted Jill and Thomas B's petition, appointing them guardianship of P.B. and A.B. The court expressed its hope that, with appropriate services and gaining maturity, P.B. would build a nurturing relationship with A.B.

P.B.'s relationship with Jill and Thomas B. deteriorated, and little more than a year after being granted guardianship of P.B., Jill and Thomas B. reached an agreement with P.B., who was then seventeen, to voluntarily terminate their guardianship of her. P.B. then petitioned the circuit court to terminate Jill and Thomas B.'s guardianship of A.B. The court left A.B.'s guardianship intact, finding termination was not in his best interest, but the court ordered the parties to implement an agreed upon visitation schedule with the goal of returning A.B. to P.B.'s custody. Six months after P.B. turned eighteen, Jill and Thomas B. petitioned the court to adopt A.B., alleging that P.B. had abandoned him.[13] P.B. responded by asking the court to give her custody of A.B. and terminate the guardianship. While the adoption proceeding was ongoing, P.B. filed her second petition to terminate the guardianship of A.B. After multiple hearings, the court denied Jill and Thomas B.'s adoption petition approximately two years after they filed it. In doing so, the court found that Jill and Thomas B. had withheld visitation from P.B., that P.B. had never waived her priority as A.B.'s parent, and that P.B.'s parental rights to A.B. remained intact. The court also observed the absence of any finding that P.B. had abused or neglected A.B. Accordingly, the court ordered the parties to participate in "reintroduction" therapy and engage in visitation between P.B. and A.B. The reintroduction therapy progressed for more than a year; then the court ordered a 50-50 shared custody plan. Shortly thereafter, P.B. filed her third petition to terminate Jill and Thomas B.'s guardianship of A.B. In response, Jill and Thomas B. argued that they should receive

---

[11] *See* W. Va. Code § 49-1-201 (defining "neglected child," and acknowledging that the conditions of neglect may not be "due primarily to a lack of financial means on the part of the parent, guardian, or custodian[.]").

[12] This statutory provision permits a family court or circuit court to "appoint a guardian for a minor" upon finding, "by clear and convincing evidence" that "the appointment is in the minor's best interest and: . . . (5) There are extraordinary circumstances that would, in all reasonable likelihood, result in serious detriment to the child if the petition is denied." *Id.* § 44-10-3(f)(5).

[13] The guardianship proceeding was stayed while the adoption was considered by another judge; however, Judge Cohee eventually consolidated the two proceedings.

greater than fifty percent custody of A.B. and alleged that P.B. was an unfit parent. The court denied P.B.'s petition, maintained the 50-50 custody arrangement, and ordered the reintroduction therapy to continue.

A few years later, Jill B. sent two self-represented letters to the circuit court requesting hearings in the guardianship case and, in part, seeking assistance with various expenses she and Thomas B. incurred to obtain treatments and therapies for A.B.[14] During subsequent hearings, Jill B. testified about A.B.'s various diagnoses and special needs and the cost of treating them. Some of A.B.'s health-care expenses are paid through Medicaid insurance provided by the DHS, but Medicaid declined to cover some of the services Jill and Thomas B. chose for A.B., because they were either received from out-of-network providers or were education services. One of the out-of-network providers was Virginia Vision Therapy Center, where A.B. received eye therapy. Jill B. detailed her unsuccessful efforts to obtain financial assistance for these services through the West Virginia Crime Victims Compensation Fund, Social Security Disability benefits, and the DHS. Jill B. complained that, because the court denied their petition to adopt A.B., their health insurance carrier will not add him to their policy, and paying the expenses Medicaid will not cover has become a hardship for their family. Jill B. also explained that A.B.'s parents were each ordered to pay fifty dollars per month in child support but neither had made any payments.

The DHS was not a party to the guardianship proceeding, and so it was not served with notice of Jill B.'s requests for hearings or of any hearings held by the circuit court in response to her requests. Nevertheless, by order entered on June 12, 2024, the court ordered the DHS to pay $26,721 to Jill B. as reimbursement for the cost of medical care and therapies received by A.B., and Jill B.'s associated mileage expenses.[15] The court also directed DHS to pay all future costs incurred for A.B.'s vision therapy and counseling services. The court identified no legal authority to support its decision requiring the DHS to pay for these services. Instead, the court commented on the fact that the abuse and neglect petition against A.B.'s father "specifically alleged that [P.B.] was a sexually abused child who was subjected to aggravated circumstances," yet P.B. "was not listed as a subject infant in the petition although she was only 13 when the petition was filed, and as a result, she was not appointed a guardian ad litem." In addition, the court took note of the findings of abuse and neglect in the order granting Jill and Thomas B. guardianship of P.B. and A.B., commenting that the judge found "both [P.B.] and [A.B.] were victims of abuse and neglect while residing with [S.B.] . . . despite the [DHS's] failure to file an appropriate abuse and neglect petition." The court then concluded "[t]hat by failing to name [P.B.] as a subject infant/victim in the original abuse and neglect petition [against A.B.'s father], the [DHS] denied [P.B.] representation from a guardian ad litem and denied both [P.B.] and [A.B.] access to reasonable and necessary services," and "[t]hat by failing to take further action after the [c]ourt established during the guardianship proceeding that both [A.B.] and [P.B.] were victims of abuse and neglect,

---

[14] Additional issues raised by Jill and Thomas B. in their self-represented letters are not relevant to our decision in this matter.

[15] The reimbursement amount covered the following expenditures: $9,608 to Virginia Vision Therapy Center; $9,950 to Thinking, Learning, Growing, for cognitive learning therapy; $180 for counseling; and $6,983 for mileage.

the Department further denied them [an] opportunity to receive reasonable and necessary services at the Department's expense."[16]

In response, the DHS intervened, objected to the June 12, 2024 order, and moved the circuit court to reconsider. In response to the court's contention that P.B. should have been named as a respondent child in the abuse and neglect proceeding against her assailant, A.B.'s father, the DHS clarified that A.B.'s father had no rights to P.B. and it would have been improper to name her in that case. The DHS also explained that it exhaustively investigated the abuse and neglect allegations against S.B. and then provided an in-home safety plan and services for the lone referral that was substantiated. Specifically addressing the court's order requiring the DHS to reimburse Jill and Thomas B., the DHS asserted that, because Jill and Thomas B. voluntarily chose to be A.B.'s legal guardians, they, like any other parent or guardian, are responsible for his financial support. Furthermore, Jill and Thomas B. failed to show that the court had authority to order the DHS to reimburse them for expenses related to a child in their sole care and custody. The DHS additionally pointed out that that Jill and Thomas B. obtained A.B.'s vision therapy from an out-of-network provider, making their reimbursement difficulty an insurance issue.

In an order entered on September 26, 2024, the circuit granted the DHS's motion to reconsider and modified its June 12 order by directing the DHS to pay $10,353 for A.B.'s treatment at Virginia Vision Therapy Center, "because there was no reasonable access to medically necessary treatment for [A.B.]," as the "nearest in-network providers were . . . two-and-a-half hours away from the child's home," and this "created an undue burden on the child and his guardians." However, the court relieved the DHS of the other reimbursements and payments required by the June 12, 2024 order.[17] The court acknowledged that A.B. was not in the DHS's custody, but reasoned that "because [A.B.] was not placed in a subsidized guardianship in the prior child and abuse and neglect case, it was fair, reasonable, and equitable, to award [Jill B.] certain reimbursements from the [DHS]." The court also ordered Jill B. "to seek out and use only in-network health care providers for the child's future health care needs."

---

[16] The circuit court also found that Jill and Thomas B. met the West Virginia Code § 49-1-206 definition of "fictive kin" such that A.B. had "resided in a fictive kinship placement since at least October 31, 2014." *See* W. Va. Code § 49-1-206 (providing definitions for terms "when used in this chapter," i.e., Chapter 49 of the West Virginia Code, and defining "fictive kin" as "an adult of at least 21 years of age, who is not a relative of the child, as defined herein, but who has an established, substantial relationship with the child, including but not limited to teachers, coaches, ministers, parents or family members of the child's friends, or foster parents with whom the child has previously been placed."). Because the definition of "fictive kin" applies only to the use of that term in relation to the child welfare provisions of Chapter 49, this term has no application to guardianships granted pursuant to West Virginia Code § 44-10-3(f).

[17] The reimbursements that the DHS was no longer ordered to pay included future treatment from Virginia Vision Therapy Center; travel costs, including mileage reimbursement; cognitive learning therapy from Thinking, Learning, Growing; and counseling services. The court noted that A.B.'s counselor now accepted Medicaid and A.B.'s GAL had agreed to pay the outstanding balance of $180 for counseling.

The DHS filed this original jurisdiction proceeding seeking a writ of prohibition to prevent the circuit court from enforcing its September 26, 2024 order requiring the DHS to pay for A.B.'s vision therapy. Prohibition lies to restrain a lower court from exceeding its legitimate powers. *See* Syl. pt. 3, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996). A court may exceed its legitimate powers by entering an order that is clearly erroneous as a matter of law. General factors we consider to determine whether a court has exceeded its legitimate powers include (1) whether the petitioner can obtain relief by other means, such as a direct appeal; (2) whether the damage or prejudice to the petitioner is correctable on appeal; (3) whether the lower tribunal erred as a matter of law; (4) whether the lower tribunal's order reflects an often repeated error or persistent disregard for procedural or substantive law; and (5) whether the lower tribunal's order raises an important issue of first impression. *See* Syl. pt. 4, *id.* These factors are general guidelines and do not all need to be met for prohibition to issue, but substantial weight is given to a lower court's clear error of law. *See id.*

The DHS contends that the circuit court erred when it ordered the DHS to pay expenses on behalf of a child in the custody of guardians who were appointed by the court in a private guardianship proceeding, and the child is not the subject of a currently pending child abuse and neglect proceeding, is not in the DHS's custody, and does not qualify for a subsidized adoption or guardianship. The respondent, Jill B. has detailed her efforts to obtain financial assistance for the significant financial burden required to manage A.B.'s special needs, but she provides no relevant legal authority requiring the DHS to share this burden under the circumstances presented. Because we find that the court's order was not supported by any legal authority, we agree with the DHS that it is entitled to a writ of prohibition preventing the enforcement of the court's order.

When the circuit court ordered the DHS to reimburse Jill B. for A.B.'s vision therapy, it failed to identify or discuss any legal authority obligating the DHS to bear the cost of A.B.'s treatment at the Virginia Vision Therapy Center. Instead, the court reasoned that, because A.B. was not placed in a subsidized guardianship in "the prior abuse and neglect case," it was "fair, reasonable, and equitable" to award Jill B. reimbursement from the DHS. The court's attempt to relate its decision to the abuse and neglect proceeding against A.B.'s father is unavailing. A.B. could not have been placed in a subsidized guardianship in the prior abuse and neglect proceeding because he was in the custody of his non-offending mother, P.B., and grandmother, S.B.[18] Moreover, this matter is a private guardianship, granted pursuant to West Virginia Code § 44-10-3, not an abuse and neglect proceeding. West Virginia Code § 44-10-3 contains no provision under which the DHS may be required to bear the cost of medical care or other services that are not covered by A.B.'s Medicaid insurance. Due to the absence of any supporting authority for the financial obligation the court imposed on the DHS in its September 26, 2024 order, we find the court clearly erred as a matter of law.

---

[18] Furthermore, the circuit court may not correct the speculative error it perceived to have occurred in the entirely separate abuse and neglect proceeding. Any relevant order by the abuse and neglect court would have become final upon the expiration of the appeal period and is not reviewable in this action. *See* W. Va. R. P. Child Abuse & Neglect Proc. 49 (Requiring a notice of appeal within thirty days of the entry of an order being appealed and perfection of the appeal within sixty days of the order's entry).

7

Weighing the *Hoover* factors, we conclude that, because the circuit court's September 26, 2024 order, is not a final, appealable order, the DHS has no means other than a writ of prohibition to obtain relief, and, therefore, the damage and prejudice caused to the DHS from being required to pay more than $10,000 that it has no legal obligation to pay, is not correctable on appeal. Finally, we have determined that the court clearly erred as a matter of law by imposing this financial obligation on the DHS, and this error is entitled to substantial weight. Accordingly, we grant the requested writ of prohibition.

Writ of Prohibition Granted.

**ISSUED:** June 4, 2025

**CONCURRED IN BY:**

Chief Justice William R. Wooton
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice C. Haley Bunn
Justice Charles S. Trump IV